In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2596

Central States, Southeast and Southwest Areas
Pension Fund, and Howard McDougall, trustee,

Plaintiffs-Appellees,

v.

Thomas C. Fulkerson and Dolly S. Fulkerson,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 0420--James F. Holderman, Judge.

Argued January 9, 2001--Decided January 29, 2001

Before Flaum, Chief Judge, and Bauer and Coffey,
Circuit Judges.

Flaum, Chief Judge. Defendants Thomas and Dolly
Fulkerson appeal the district court's grant of
summary judgment to plaintiff Central States on
its claim for withdrawal liability. The
Fulkersons argue that the district court erred in
determining that their activities met the
statutory requirements for liability. For the
reasons stated herein, we reverse and remand.

I. Background

Thomas ("Tom") and Dolly are husband and wife.
They are the only shareholders of Holmes Freight
Lines, Inc. ("Holmes"), a trucking company that
is now in bankruptcy. Tom is the President of
Holmes and owns 68% of its stock, while Dolly is
a 32% owner and is the Vice-President, Secretary,
and a member of the Board of Directors, though
the defendants claim she has never been active in
running Holmes.

In addition to managing Holmes, Tom leased a
few properties. At his direction, Holmes
purchased three parcels of land between January,
1985 and January, 1987. The properties were
located in Portland, Oregon, Salt Lake City,
Utah, and Auburn, Washington. Holmes built
trucking terminals on the properties and then
sold these back to Tom. Tom then leased the
properties to Action Express, Inc. ("Action").

Action was another trucking company owned by the Fulkersons' sons, though Holmes and Action were always maintained as separate corporations and Tom and Dolly did not have any interest in or participate in the management of Action. Tom negotiated both the purchases of the property and the leases. These leases were "triple net leases," under which the tenant is responsible for most obligations such as maintenance, operating expenses, real estate taxes, and insurance (though Holmes may have paid the insurance premium on these properties and have been reimbursed by Tom). Thus, Tom had few obligations associated with being a traditional landlord. Tom sold the Auburn property in 1990 and the Portland property in 1995, realizing gains on both sales. The Salt Lake City property is still leased to Action. Tom has not devoted more than five hours in any year in connection with the properties, and claims that he purchased the properties for investment purposes. According to Tom, he does little more than deposit the rent checks and make mortgage payments, and reports the rental income on Schedule E of his federal income tax forms for supplemental income.

Holmes was subject to various collective bargaining agreements that required it to contribute to Central States. After Holmes ceased operations in July, 1998, it began self-liquidating and paid unsecured creditors one-quarter of the amount they were owed. Holmes paid Central States $236,126.45, a fourth of the amount Holmes believed sufficient to cover its pension obligations. Central States, on the other hand, calculated Holmes's withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") to be $1,889,011.61. See generally Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799, 803-04 (7th Cir. 1999) (discussing the mechanics of withdrawal liability). The fund decided to sue the Fulkersons to recover the deficiency.

In the district court on a motion for summary judgment, Central States argued that the Fulkersons' leasing activities constituted an unincorporated trade or business under 29 U.S.C. sec. 1301(b)(1), which states that all "trades or businesses," whether or not they are incorporated, shall be treated as a single employer. Under this theory, because both the supposed leasing business and Holmes are under the common control of the Fulkersons, the leasing business was obligated to pay the remainder of Holmes's withdrawal liability. Since the leasing business was unincorporated, the Fulkersons became personally liable for these payments to Central States. See Central States, Southeast and

Southwest Areas Pension Fund v. Johnson, 991 F.2d 387, 388-89 (7th Cir. 1993) (describing a similar theory of liability).

The Fulkersons responded with a variety of arguments, which primarily center on the claim that they did not spend enough time engaging in leasing activities for these to constitute a "trade or business" as required by the statute. They also offered an expert witness in the real estate market who opined that the triple net leases were economically identical to passive investments such as stocks or bonds. In the alternative, they contended that Dolly had shown that she did not intend to be a partner in the alleged leasing business, and so she should not be personally liable for the withdrawal liability even if Tom is. The district court rejected all of the Fulkersons' arguments, granted summary judgment to the fund, and ordered the Fulkersons to pay Central States the withdrawal liability plus liquidated damages, interest, and attorneys' fees, as provided in 29 U.S.C. sec. 1132(g)(2). The Fulkersons now appeal the district court's determinations that the leasing was a trade or business and that Dolly intended to be a partner with Tom.

II.  Discussion

A.  Standard of Review

The initial question presented by this case is the standard by which we review the district court's decision. The district court's interpretation of the statutory phrase "trade or business" is, of course, purely a question of law that we review de novo. See Salve Regina College v. Russell, 499 U.S. 225, 231-32 (1991); Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 467 (7th Cir. 2000). Summary judgments are reviewed de novo, viewing all of the facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Opp v. Wheaton Van Lines, Inc., 231 F.3d 1060, 1063 (7th Cir. 2000).

However, Central States argues that in the circumstances of this case we review the district court's "characterizations" of undisputed historical facts, which apparently means mixed questions of law and fact, under a clearly erroneous standard of review, citing Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369, 1373-74 (7th Cir. 1992) and Central States, Southeast and Southwest Pension Fund v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir. 1992). Central States claims that for both the trade or business issue and the

partnership question the underlying facts are undisputed, the district court merely applied the law to the facts, and the Fulkersons have no right to a jury trial. According to the fund, the satisfaction of these three conditions requires this court to deferentially review the district court's decision. The Fulkersons argue that Slotky and Personnel are unsound to the extent that these opinions contradict well-settled law of the Supreme Court and this circuit regarding review of summary judgments, and in the alternative that they are entitled to a jury trial; thus, a de novo standard should be applied.

We agree with the Fulkersons that our review is de novo on the trade or business question because, as explained more fully below, the district court committed a legal error in interpreting the statute. Slotky and Personnel are inapplicable for this reason. Thus, we decline the Fulkersons' invitation to partially overrule these cases.

B.   Trade or Business

An employer incurs withdrawal liability for withdrawing from a multiemployer pension plan, 29 U.S.C. sec. 1381(a), and employer means all "trades or businesses (whether or not incorporated)" that are under common control, 29 U.S.C. sec. 1301(b)(1). Thus, in order to impose withdrawal liability on an organization other than the one obligated to the fund, two conditions must be satisfied: (1) the organization must be under common control with the obligated corporation; and (2) it must be a trade or business. The Fulkersons do not dispute that Tom Fulkerson controlled both Holmes and the leasing. Thus, the only question is whether Tom's leasing constitutes a trade or business.

As in all statutory interpretation cases, we begin with the statutory language. See Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999). Statutory terms or words will be construed according to their ordinary, common meaning unless these are defined by the statute or the statutory context requires a different definition. See Walters v. Metropolitan Educ. Enters., Inc., 519 U.S. 202, 207 (1997); Perrin v. United States, 444 U.S. 37, 42 (1979). Section 1301(b)(1) presents no interpretive difficulties when it is used to impute withdrawal liability to another corporation or other formally recognized business organization that is under common control with the obligated entity. However, thorny questions can arise when informal economic activities are claimed to be a trade or business. In these circumstances, given the interpretive

principles outlined above and the fact that MPPAA does not define "trades or businesses," we reaffirm that the test for what constitutes a trade or business established in Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987) applies in determining whether an activity is a trade or business for purposes of sec. 1301(b)(1)./1 See Personnel, 974 F.2d at 794; see also Connors v. Incoal, Inc., 995 F.2d 245, 250-51 & n.7. For an activity to be a trade or business under Groetzinger, a person must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity. 480 U.S. at 35. While Groetzinger was interpreting only a specific provision in the tax code, its test comports with the common meaning of trade or business and thus can be used more generally./2 One purpose of the Groetzinger test is to distinguish trades or business from investments, which are not trades or business and thus cannot form a basis for imputing withdrawal liability under sec. 1301(b)(1). See Personnel, 974 F.2d at 794.

The district court committed a legal error in determining that the second part of the trade or business test was satisfied. The district court relied only on the Fulkersons' holding of the leases alone, which they had done for over ten years, in concluding their leasing had been continuous and regular conduct; this was incorrect. Actions of a person, such as negotiating leases, researching properties, maintaining or repairing properties, etc., are business or trade conduct and thus are appropriately considered in determining whether the continuity and regularity prong of Groetzinger is satisfied. However, possession of a property, be it stocks, commodities, leases, or something else, without more is the hallmark of an investment. Thus, mere ownership of a property (as opposed to activities taken with regard to the property) cannot be considered in determining whether conduct is regular or continuous./3

Central States argues that even if the holding of the leases is not considered, Tom Fulkerson engaged in activities such as selecting the properties, negotiating purchases, and negotiating the leases. However, the Fulkersons presented evidence, including an expert witness, that the leases were an investment that rarely required the time or attention of the Fulkersons. Tom Fulkerson averred that he never spent more than five hours in a year dealing with the leases or the leased properties. Once the possession of the leases is removed from the equation, a reasonable factfinder could determine that the leasing activities were not sufficiently continuous and regular to constitute a trade or

business.

In making this decision, we are mindful that sec. 1301 (b)(1) was not intended to impose automatic personal liability on individuals who own companies that are required to contribute to pension funds. The plain statutory language demonstrates this by stating that only "trades or businesses" can be considered as a single employer, and we have held that shareholders generally are not responsible for withdrawal liability. See Johnson, 991 F.2d at 390-91; Plumbers' Pension Fund, Local 130 v. Niedrich, 891 F.2d 1297, 1299-1301 (7th Cir. 1989). Given the prevalence of investing, permitting the holding of investments (which will normally satisfy the first prong of Groetzinger since the purpose is to produce income) without more to be considered regular and continuous activity would eviscerate the limitations placed in the text of sec. 1301(b)(1). Pension funds have statutory means to recover assets that are transferred to evade withdrawal liability, such as 29 U.S.C. sec. 1392(c), and must employ these rather than a personal liability mechanism not granted to them by Congress.

Central States has a couple of arguments in support of the district court's holding, though we find these unconvincing. First, it claims that Tom Fulkerson's leasing activities are virtually identical to those in Personnel, where the defendant was held to be responsible for the withdrawal liability. However, the defendant in Personnel much more frequently engaged in activities related to leasing, such as buying and selling multiple properties annually and advertising, than the Fulkersons. 974 F.2d at 794-95. Thus, in Personnel the defendant spent enough time engaged in actions related to leasing to show that his conduct was regular and continuous. In the present case, taking the facts regarding the minimal time spent on leasing activities as presented by the Fulkersons, we are unable to make such a conclusion. For example, in contrast to the numerous real estate sales and purchases the defendant in Personnel transacted every year, Tom Fulkerson bought only three properties and sold two over a span of more than ten years.

Second, Central States argues that "trades or businesses" should be construed broadly in accordance with MPPAA's policy to prevent the avoidance of withdrawal liability obligations by fractionalizing assets. Central States is correct that this was a policy behind MPPAA, see, e.g., Johnson, 991 F.2d at 388, Personnel, 974 F.2d at 794, but knowing what the policy is tells us little about how far it should extend. MPPAA,

like much other legislation, is a compromise embodying competing purposes and is intended to effectuate certain policies only to a restricted degree. See Central States, Southeast and Southwest Areas Health and Welfare Fund v. Cullum Cos., 973 F.2d 1333, 1339 (7th Cir. 1992) (explaining that a number of MPPAA's provisions were meant to limit the impact and application of withdrawal liability and that giving these less effect than the plain language requires would distort the statutory scheme). The only way in which we can determine the boundaries on these policies is by examining the statutory language. This explains why we have in the past rejected policy-based interpretations of MPPAA that did not find support in the text. See Trustees of Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Leaseway Transp. Corp., 76 F.3d 824, 830-31 (7th Cir. 1996); Johnson, 991 F.2d at 390-91; Cullum Cos., 973 F.2d at 1338-40. Congress demarcated the extent to which the anti-fractionalization policy would be pursued in the text of the MPPAA, such as by not imposing personal liability on shareholders, as explained above. The provision imposes liability only on "trades or businesses," and those words must be given their ordinary meaning in accordance with established canons of interpretation. Under a proper construction of the language of sec. 1301(b)(1), a reasonable factfinder could determine that the Fulkersons' leasing activities do not constitute a trade or business./4

III.  Conclusion

     The plain meaning of MPPAA precludes considering the passive holding of property in determining whether an activity rises to the level of a trade or business. Thus, the district court committed error by relying only on the fact that the Fulkersons had held the leases for ten years in determining whether the continuity and regularity prong of Groetzinger was satisfied. On remand (to which Circuit Rule 36 will apply) only the actions of the Fulkersons regarding the leasing, rather than mere possession of the leases, should be considered. For the reasons stated herein, we Reverse the decision of the district court and Remand for further proceedings consistent with this opinion.

FOOTNOTES

/1 We also reaffirm that no economic nexus is required between the obligated organization and trades or business under common control because the statute does not impose one. See Personnel, 974 F.2d at 793; Slotky, 956 F.2d at 1374.

/2 In Central States, Southeast and Southwest Areas Pension Fund v. Ditello, 974 F.2d 887, 889-90 (7th Cir. 1992), we cautioned against using tax code cases to interpret MPPAA. Ditello noted that the phrase "trade or business" appears almost two hundred times in the tax code. Id. at 889. The particular meaning given to any single instance of the phrase may be shaped by the surrounding statutory context of the tax code and thus involve considerations that are absent in MPPAA. While we adhere to the idea that courts must be careful in using tax code cases to construe MPPAA because of the different context, Groetzinger states the common, ordinary definition of trade or business and is thus appropriately used to interpret sec. 1301(b)(1).

/3 Board of Trustees of Western Conference of Teamsters Pension Trust Fund v. Lafrenz, 837 F.2d 892, 894-95 & n.7 (9th Cir. 1988) contains language indicating that passively holding investments might be considered a trade or business under MPPAA, though it limits its holding to the facts before it. To the extent that Lafrenz might be read to conflict with our decision, we decline to follow it. As stated in Personnel and supported by Groetzinger, passively holding investments without more cannot normally be considered to be a trade or business.

/4 This court's holding that the district court erred in deciding that Tom Fulkerson's leasing is a trade or business vacates the district court's finding that Dolly was a partner of Tom in the leasing business. Thus, we need not reach the Fulkersons' argument that the district court incorrectly determined that Dolly intended to be Tom's partner.