In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-1964 & 01-2379

Central States, Southeast &
Southwest Areas Pension Fund, et al.,

Plaintiffs-Appellees,

v.

Orin S. Neiman,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 1181--John W. Darrah, Judge.

Argued February 21, 2002--Decided April 2, 2002


   Before Flaum, Chief Judge, and Harlington
Wood, Jr. and Williams, Circuit Judges.

   Flaum, Chief Judge.  Following a bench
trial, the district court held that
Defendant-Appellant Orin S. Neiman
operated a sole proprietorship in 1991
and 1993, resulting in withdrawal
liability under the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C.
sec. 1001, et seq. Neiman appeals, and,
for the reasons stated herein, we affirm.

I.  Background

   Central States, Southeast and Southwest
Areas Pension Fund ("Central States") is
a multi-employer pension fund. As is
evident from many of the citations below,
Central States is actively engaged in
enforcing its rights under ERISA sec.
4001(b)(1), under which an employer that
reduces the amount it contributes to a
multi-employer pension plan may be liable
for "withdrawal liability." 29 U.S.C.
sec. 1381(b)(1). Because one employer's
withdrawal results in decreased payments
even though employee benefits may have
vested, ERISA imposes a statutory
obligation to continue payments despite
the cessation of contributions. ERISA
imposes this statutory obligation on "all
trades or businesses" under "common
control" with the company that withdrew

from the fund. 29 U.S.C. sec. 1301(b)(1). This prevents employers from "fractionalizing" their assets among several entities to avoid liability. See Central States, Southeast & Southwest Areas Pension Fund v. Ditello, 974 F.2d 887, 890 (7th Cir. 1992). Both parties agree that the only issue in this case is whether Neiman operated a sole proprietorship under common control with South Coast Transport Company ("South Coast"), which partially withdrew from Central States in 1991 and completely withdrew in 1993. If Neiman did, then the sole proprietorships--and Neiman personally--are subject to withdrawal liability under ERISA.

A. 1991

In 1991, Neiman owned a family of interstate trucking companies that included both South Coast and Transcon, Inc. On December 31, 1991, Central States determined that South Coast partially withdrew from the pension fund due to a substantial and permanent decline in contributions. This partial withdrawal resulted in liability in the amount of $1,750,527.76. At the time South Coast withdrew, Neiman devoted all of his daily activity to Transcon, where he served as president. However, Neiman was also a shareholder and officer of NCO Financial Corporation ("NCO"), a real estate management company. Throughout 1991, Neiman received regular monthly payments from NCO in the total amount of $36,875.45. NCO reported these payments as non-employee compensation on IRS Form 1099. NCO recorded many of these payments in a "Cash Disbursement Journal," and characterized them as "mgmt. fees."

Neiman forwarded all tax documents to his accountant, Arnold Anisgarten. Anisgarten was responsible for completing Neiman's income tax returns. In this case, Anisgarten reported the income from NCO on IRS Schedule C, which is entitled "Profit or Loss from Business (Sole Proprietorship)." Beyond the selection of the form, Anisgarten provided information on Schedule C suggesting that Neiman provided management services to NCO. For example, Anisgarten checked a box stating that Neiman materially participated in the operation of the business throughout the year. In addition, Anisgarten stated

that the business's accounting method was "cash," that the principal business or profession was "business and management/management," and that all of Neiman's investment was at risk. Neiman signed the income tax return before forwarding it to the Internal Revenue Service. Neiman's signature attested to the fact that he had examined the return and believed it was true and correct.

## B.  1993

On December 16, 1993, South Coast permanently ceased contributions to Central States and thus incurred a complete withdrawal. The complete withdrawal resulted in liability in the amount of $503,325.71. Several months prior to the complete withdrawal, Neiman had been employed by TC Services, a Transcon subsidiary. In September 1993, Neiman and Transcon's other officers sold their shares of stock to Michael Kibler and a group of investors. Transcon stated in a proxy statement filed with the SEC that Neiman would serve as a consultant for the remaining months in 1993 as part of a severance package. Neiman received several payments from Transcon at the end of 1993 totaling slightly more than $100,000. Like NCO, Transcon reported these payments on three separate 1099s, which reflected non-employee compensation. At least one 1099 contained the notation "Consult," although the record is unclear concerning who marked the form.

Anisgarten also prepared Neiman's 1993 income tax return. Anisgarten reported the Transcon payments on IRS Schedule C, Profit or Loss From Business (Sole Proprietorship). Once again, the Schedule C reflected that the principal business or profession was "Business and Management--Management Services." The Schedule C also represented that Neiman materially participated in the business, that all of the taxpayer's investment was at risk, and that the business referred to had previously filed a Schedule C. In addition, by filing the 1993 Schedule C, Neiman was able to claim business tax deductions totaling $107,285. Anisgarten based these deductions on a business expense ledger, prepared at Neiman's direction, that included typical business expenses such as travel, entertainment,

Federal Express charges, payments for office supplies, and an advance to NCO. Neiman signed the 1993 income tax return before forwarding it to the IRS.

## C. Proceedings

Central States sued Neiman to recover the shortfalls attributable to South Coast's withdrawal from the pension fund in 1991 and 1993. Central States' theory of recovery derived from the fact that all "trades or businesses" under Neiman's control were responsible for the missing funds, and that Neiman operated businesses providing management and consulting services in both 1991 and 1993. Both parties moved for summary judgment before the district court./1 In support of its motion, Central States relied exclusively upon documentary evidence, including Neiman's income tax returns from 1991 and 1993, the 1099s, NCO's Cash Disbursement Journal, Transcon's proxy statement to the SEC, and the business expense ledger prepared at Neiman's direction. In response, both Neiman and Anisgarten submitted affidavits swearing that Neiman did not operate a trade or business in either 1991 or 1993.

The district court denied both motions. With respect to Central States, the district court held that the tax documents did not unequivocally prove the existence of a trade or business because Neiman's and Anisgarten's affidavits attempted to explain the use of Schedule C, thus creating a genuine issue of material fact and making summary disposition improper. The district court ruled that Central States offered no evidence regarding whether Neiman engaged in the activity for income or profit. Similarly, the district court held that Neiman's and Anisgarten's affidavits were insufficient to prove that Neiman had not engaged in a trade or business in 1991 or 1993. In the end, neither party had submitted "any additional helpful evidence" beyond the income tax returns describing the disputed activities. Central States, Southeast & Southwest Areas Pension Fund v. Neiman, No. 99 C 1181, slip op. at 17 (N.D. Ill. March 23, 2000).

Following the denial of cross-motions

for summary judgment, Judge Darrah conducted a bench trial. Central States rested entirely on the documentary evidence already before the district court. Neiman moved for judgment as a matter of law, arguing that Central States failed to carry its burden of proving that Neiman operated a trade or business. The district court denied that motion.

Both Neiman and Anisgarten testified for the defense. Anisgarten described his practices in completing Neiman's tax return in both 1991 and 1993. Although he believed that the $36,000 received from NCO, and the $100,000 from Transcon, should have been reported as salary on W-2 forms, Anisgarten reported the income on Schedule C because it did not have any effect on the amount of income tax Neiman owed. Moreover, Anisgarten stated that he described Neiman's business activities as "business and management services" because it was a "catch-all" term included within the software program he used to complete Neiman's tax return. Anisgarten testified that although he checked the box indicating Neiman materially participated in the activity generating the income, it did not mean Neiman operated a trade or business in 1991. Anisgarten offered similar explanations regarding his completion of Neiman's 1993 income tax return.

Neiman attempted to explain further the documentary evidence offered by Central States. Neiman testified that the monthly payments from NCO represented compensation for a business relationship Neiman established between a warehouse and its tenants. While Neiman did not perform any services to earn the money in 1991, he had previously initiated the relationship by introducing the two parties. Neiman also testified about payments received from Transcon in the fall of 1993. Neiman stated that after his business relationship with Transcon ended, he spent the last three months of 1993 seeking new employment and looking for another business to purchase. According to Neiman, he did not provide any consulting services to Transcon. Rather, Neiman claimed that Transcon paid him for other reasons. Neiman asserted that the first payment from Transcon rep resented two months of severance compensation, which he negotiated upon

leaving the company. The second payment constituted reimbursement for corporate expenses incurred while he was employed at Transcon. The third was for payment of accrued interest on Transcon preferred stock or notes that Neiman previously owned.

Neiman also offered, and the district court considered, the deposition testimony of Michael Kibler, one of the investors who purchased Transcon from Neiman in 1993./2 In that deposition, Kibler testified that Neiman never performed consulting services for Transcon in 1993 after Neiman left the company.

At the close of evidence, Judge Darrah issued findings of fact and conclusions of law. Although Judge Darrah's findings of fact were less than comprehensive, he held that (1) Neiman's testimony was not credible; (2) Neiman engaged in activities with NCO and Transcon for income or profit; (3) Neiman's activities were regular and continuous; and (4) Neiman operated a trade or business in both 1991 and 1993. Accordingly, Judge Darrah entered judgment for Central States in the amount of $3,747,143.61, which represents the amount of withdrawal liability in addition to interest, liquidated damages, attorney's fees and costs./3 Neiman appeals.

II.  Discussion

A.  Standard of Review

The initial question in this case concerns the appropriate standard of review. Neiman urges this court to adopt a de novo standard, arguing that the determination of whether an individual operated a trade or business under ERISA is a pure question of law. In contrast, Central States maintains that Neiman is challenging the district court's findings of fact that: (1) Neiman operated a trade or business during 1991; (2) Neiman operated a trade or business during 1993; and (3) Neiman's testimony was not credible. Central States also notes the procedural posture of this case, which arrives at this court following a bench trial below.

This is not the first instance in which this Court has struggled to define the

appropriate standard of review. In our first case to address the issue, Central States, Southeast and Southwest Areas Pension Fund v. Slotky, 956 F.2d 1369 (7th Cir. 1992), we held that the determination of whether an individual operated a "trade or business" under ERISA was "a question of fact, even though all the 'facts' as a layman would perceive them are agreed upon and the only dispute is over characterization." Id. at 1373. Because "the application of a legal standard to undisputed facts is classified as a fact for delimiting the respective spheres of trial and appellate court," we deferred to the district court's application in the same way we would defer to its factual findings. Id. See also Central States, Southeast and Southwest Areas Pension Fund v. Personnel, Inc., 974 F.2d 789, 792 (7th Cir. 1992) ("where we examine[ ] an assessment of withdrawal liability, we review[ ] the district court's conclusions for clear error because the facts were undisputed and the only factual issue was one of characterization.").

Appellants in two later cases urged this court to revisit the appropriate standard of review following summary disposition of whether an individual operated a trade or business resulting in withdrawal liability; in each, however, we declined to do so because the district court erred as a matter of law in interpreting the statutory phrase "trade or business."/4 See Central States, Southeast and Southwest Areas Pension Fund v. White, 258 F.3d 636, 640 (7th Cir. 2001) ("We need not revisit [Slotky and Personnel] to determine whether a lower standard of review is appropriate on a review of summary judgment because . . . we conclude that the district court erred on a question of law in interpreting the statute."); Central States, Southeast and Southwest Areas Pension Fund v. Fulkerson, 238 F.3d 891, 894 (7th Cir. 2001) ("We agree . . . that our review is de novo on the trade or business question because . . . the district court committed a legal error in interpreting the statute.").

In this case, there can be no question that we review the district court's decision under a clearly erroneous standard. As the Supreme Court held in

Commission v. Groetzinger, 480 U.S. 23, 36 (1987), determining whether an activity is a trade or business "requires an examination of the facts of each case." Id. (internal quotations omitted). In both White and Personnel, the only justification for possibly reexamining the appropriate standard of review concerned the tension between traditional review following summary judgment and the unique standard given the fact-intensive circumstances of cases involving the term "trade or business." Unlike our prior precedents, this case arrives following a bench trial after which the district court made express findings of fact and conclusions of law. Thus, we are not faced with the situation in Slotky and Personnel, in which we decided to review for clear error even though the traditional standard of review following summary judgment is de novo.

The Supreme Court has admonished the courts of appeals to avoid encroaching upon the proper province of the district court in cases like the present one.

"In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual questions de novo." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). With this standard in mind, we turn to the merits of Neiman's appeal.

B.  Trade or Business

ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. sec.sec. 1381-1461, subjects employers who withdraw from a multi-employer pension fund to "withdrawal liability" equal to its proportionate share of the plan's unfunded vested benefits. 19 U.S.C. sec.

1381(b)(1); Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 725 (1984). The MPPAA imposes this statutory obligation on "all employees of trades or businesses (whether or not incorporated) which are under common control," such that each business under common control is jointly and severally liable to the pension fund. 29 U.S.C. sec. 1301(b)(1). Thus, a plaintiff must demonstrate two distinct facts to establish withdrawal liability on an organization other than the one originally obligated to the pension fund: first, the defendant-organization must fall under common control as the owing entity; and second, the defendant-organization must be engaged in a "trade or business." Fulkerson, 238 F.3d at 895. Both parties concede that the only issue in this case concerns whether Neiman operated a trade or business in 1991 and 1993. If he did, then the businesses were under common control with South Coast, and the sole proprietorships--as well as Neiman individually--are jointly and severally subject to withdrawal liability.

In assessing whether Neiman operated a trade or business, we rely on the test enunciated in Commissioner of Internal Revenue v. Groetzinger, 480 U.S. 23 (1987). See White, 238 F.3d at 895; Personnel, 974 F.2d at 794. "For an activity to be a trade or business under Groetzinger, a person must engage in the activity: (1) for the primary purpose of income or profit; and (2) with continuity and regularity." Fulkerson, 238 F.3d at 895 (citing Groetzinger, 480 U.S. at 35). Here, the district court's decision that Neiman operated a trade or business as defined by Groetzinger was not clear error. Central States proffered documentary evidence tending to show the existence of a trade or business engaged in for income or profit. Indeed, Neiman does not dispute the fact that the compensation he received from both NCO and Transcon was for income or profit. Nor did the district court commit clear error in ruling that the activity was regular and continuous. In 1991, NCO's cash disbursement journal reflected monthly payments to Neiman in exchange for "management fees." In 1993, Neiman deducted business expenses incurred throughout the previous year related to the business described in his Schedule C.

These detailed expenses support the district court's finding of continuity.

Neiman maintains that the payments he received from NCO are more akin to a passive investment and do not reflect the regular and continuous income that evinces a trade or business. In Fulkerson, we held that the district court committed reversible error in applying the second prong of the Groetzinger analysis, i.e., in determining whether an activity was regular and continuous. Fulkerson, 238 F.3d at 895-96. In that case, we held that the mere possession of property over a period of time did not establish regular and continuous activity because it was more akin to a "passive investment." Id. Neiman urges this court to adopt a similar approach with respect to his dealings with NCO. We decline to do so. Neiman's explanation regarding his income tax return and NCO's Cash Disbursement Journal is entirely plausible, but it is an argument rejected by the district court. Because we may not second guess the district court's credibility determination, we are left with documentary evidence that shows regular and continuous payments in exchange for management services. This is entirely distinct from the passive property ownership at issue in Fulkerson. See also White, 258 F.3d at 643.

Next, Neiman argues that because the documentary evidence submitted by Central States was not sufficient to establish a trade or business at the summary judgment stage, it was necessarily inadequate at the bench trial as well. Neiman contends that he was entitled to judgment as a matter of law because Central States offered nothing beyond the documentary evidence already before the court. Neiman's argument, however, is based on an incorrect premise: that the evidence at the summary judgment stage was the same as that presented at the bench trial. This clearly is not the case. After conducting a brief bench trial, Judge Darrah had the opportunity to observe Neiman testify, and the court ruled specifically that he was not credible. Thus, Judge Darrah accepted the validity of the documentary evidence over Neiman's purported explanations-- a credibility determination entirely within the province of the district court.

Neiman also claims that even if the documentary evidence tends to establish that he operated a trade or business, there was substantial evidence at trial proving that he did not. In particular, Neiman highlights Anisgarten's testimony and Kibler's deposition. Judge Darrah did not mention these two sources of testimony in his findings of fact, which handicaps our ability to determine whether his findings were supported. However, while this omission is troubling, it is not enough to warrant reversal. The documentary evidence submitted by Central States offered one version of Neiman's activities in 1991 and 1993. Neiman's testimony, which was corroborated by Anisgarten and Kibler, offered a competing--and mutually exclusive-- account. Once the district court rejected Neiman's version of the facts, he implicitly disregarded the corroborating testimony offered by Anisgarten and Kibler. As we have already stated, there was evidence within this record to support the existence of an activity that was engaged in for income or profit and that was regular and continuous. That we might have decided the factual issues differently is not sufficient to upset the district court's judgment. See Anderson, 470 U.S. at 573-74.

Finally, Neiman contends that the imposition of withdrawal liability against him individually contravenes ERISA's purpose. See White, 258 F.3d at 644 ("A law with the sound purpose of preventing fractionalization should not be stretched to such an extreme application that would expose a common owner of a completely unrelated personal business to such withdrawal liability."). In crafting this argument, Neiman misconstrues the judgment below. Although the district court's order may have the effect of imposing individual liability, it does so only because the trades or businesses owned by Neiman were under common control with an entity that owed substantial amounts to the pension fund. If anything, the judgment effects ERISA's purpose by protecting vested employee benefits from employers who attempt to avoid their responsibilities. See White, 258 F.3d at 644 (citing Bd. of Trustees of the Western Conference of Teamsters Pension Trust Fund v. H.F. Johnson, Inc.,

830 F.2d 1009, 1013 (9th Cir. 1987) ("Congress enacted sec. 1301(b) in order to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities.")). The fact that Neiman's personal activities were wholly unrelated to South Coast's trucking operations is without moment because we recently reaffirmed the principle that an economic nexus between businesses under common control need not exist to impose withdrawal liability. See White, 258 F.3d at 641; Fulkerson, 238 F.3d at 895 n.1.

III.  Conclusion

While recognizing the force of Neiman's arguments, we are constrained to conclude that they cannot surmount the stringent standard of review in this case. Put simply, Neiman cannot overcome the critical fact that the documentary evidence satisfies the two elements of the Groeztinger analysis. Although the district court's opinion does not contain as complete an analysis as is customary in fact-intensive cases, the deferential standard of review in this case requires us to conclude that the judgment finding that Neiman operated a trade or business in 1991 and 1993 below was not clearly erroneous. The documentary evidence supported the trial court's findings of fact. Accordingly, we AFFIRM the decision of the district court.

FOOTNOTES

/1 The case was originally assigned to Judge Charles P. Kocoras, who ruled on the parties' motions for summary judgment. Later, the case was reassigned to Judge John W. Darrah, who conducted a bench trial and ultimately entered judgment.

/2 Central States disputes whether it is proper for this court to consider Kibler's deposition testimony because it does not meet the requirements for admission pursuant to Federal Rule of Civil Procedure 32. In his written order, Judge Darrah stated that because Central States failed to object at trial, the court would admit the deposition. See Central States, Southeast and Southwest Areas Pension Fund v. Neiman, No. 99 C 1181 at 5 n. 1 (N.D. Ill. March 19, 2001). Central States is correct that Judge Darrah's ruling is inconsistent with his own statements at trial, where he stated that counsel could "put that in a motion if you wish." Further, when counsel attempted to object to the introduction of the

deposition at trial, the following colloquy occurred:

THE COURT: I have already ruled on that.

MR. WEITHERS: But, Your Honor, I do have a different objection.

THE COURT: I thought I asked you to put that in writing. You can put that in your closing argument if you wish.

MR. WEITHERS: Your Honor, as a separate motion or as part of the argument?

THE COURT: You can put it in as part of the argument. You can respond to it in the argument, if you wish. Okay.

This hardly constitutes a waiver by Central States. However, we need not rule on the admission of the deposition because, as discussed below, the district court considered it and implicitly rejected its contents.

/3 Judge Darrah initially entered judgment on March 19, 2001. Later, Judge Darrah entered a supplemental judgment in favor of Central States that included interest, liquidated damages, attorney's fees and costs. Neiman filed timely appeals to both orders, and this court consolidated them on appeal.

/4 At least one circuit has disagreed with our decision to review for clear error the district court's determination on summary judgment that a particular activity constituted a trade or business. In Connors, et al. v. Incoal, Inc., 995 F.2d 245, 251 n. 9 (D.C. Cir. 1993), the court noted that the clearly erroneous standard is im proper following a grant of summary judgment. The court went on to state, however, that "because a district court's finding that an enterprise is (or is not) a trade or business constitutes a factual determination, that factual determination is reviewable after trial only for clear error." Id. at 252 (citing Pullman-Standard v. Swint, 456 U.S. 273, 287 (1982) (emphasis in original)).